**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER COLEMAN,** | ) | |
| **Petitioner,** | ) | **Civil Action No. 7:19-cv-00386** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **HAROLD W. CLARKE, Director,** | ) | **By: Norman K. Moon** |
| **Respondent.** | ) | **Senior United States District Judge** |

Petitioner Christopher Coleman, a Virginia inmate, by counsel, filed a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the validity of his sentences for convictions imposed on August 24, 2012, by the Roanoke City Circuit Court and the Roanoke County Circuit Court in a combined sentencing hearing. His total sentence from both courts was forty-six years, twenty-eight years to serve, with eighteen years suspended.

In his petition, Coleman asserts a claim for ineffective assistance of counsel at his sentencing hearing. Respondent has filed a motion to dismiss Coleman's § 2254 petition, and Coleman, by counsel, has responded, making the matter ripe for disposition.

Upon review of the record, I have determined that the petition is untimely as to the judgments entered by the Roanoke County Circuit Court, and as to those judgments, I will grant the motion to dismiss. Considering the merits of Coleman's claim on the Roanoke City Circuit Court judgment, I conclude that Coleman has failed to show that the state court's decision was contrary to or an unreasonable application of clearly established federal law, nor has he shown that the decision was based on an unreasonable determination of the facts. Accordingly, I will grant the motion to dismiss the claim on this judgment as well.

## I.   FACTUAL BACKGROUND

*A.   Roanoke County*

In the early morning hours on March 17, 2011, Coleman and his friend Taylor Nutt were intoxicated. Nutt was staying at the home of David Moore in Roanoke County, and when Nutt and Coleman arrived around midnight, severely intoxicated, Moore asked Coleman to leave.  Moore's wife, Mary Cook-Moore, was staying at her parents' home across the street, and rather than have Coleman attempt to drive elsewhere while very intoxicated, she brought Coleman to her parents' home to sleep on the couch.  Mary went to the safe to get her pain medication, and when she did, Coleman saw the 45-caliber handgun that belonged to Mary's father and grabbed the gun from the safe.  According to the Commonwealth, Mary told Coleman that she was afraid of guns and asked him to put the gun back in the safe.  He said he knew what he was doing and that if she followed his instructions on how to handle the gun, no one would get hurt.  He loaded and unloaded the gun several times and began pointing it around the room, including at her.  He pulled the trigger sometimes.  She was terrified and kept asking him to stop.  Then he shot her.  (Habeas R. 41.)[1]

Her mother heard the noise and then heard Mary yell that she had been shot.  Rushing downstairs to check on her daughter, Mrs. Cook saw Coleman sitting beside Mary, saying he was an Army medic and could help her.  Coleman then told Mrs. Cook that Mary shot herself, while Mary kept saying that Coleman had shot her.  Mrs. Cook ordered Coleman to get away from her daughter, and he left the home.  Mrs. Cook called for an ambulance.  (*Id*. at 40.)

---

[1]  Paper copies of the habeas record and the Roanoke County Circuit Court record are on file with the Clerk; an electronic copy of the Roanoke City Circuit Court record is also on file. Most references herein will be to the habeas record ("Habeas R.") but some will be to trial court records ("Roanoke Co. Trial R." or "Roanoke City Trial R.", respectively).  Page numbers refer to the typewritten numbers in the lower right corner of the records.

When the police arrived, Mary told them that Coleman had shot her with a 45-caliber gun, and then she was transported to the hospital. The police spoke with Mrs. Cook, who advised them what she knew, including that her daughter had said that it was an accident. The gun was found on the couch where Mary and Coleman had been sitting. One cartridge ejected from the gun, and no other expended cartridges or fired bullets were found.

Other officers went to Mr. Moore's home, where it was believed that Coleman had returned. Moore, Nutt, and Coleman all came outside. Moore told officers that Coleman had just run into the house and said he'd shot Moore's wife. Police took Coleman into custody, noting that he had a strong odor of alcohol about him. When they questioned him, Coleman said that he was showing Mary how to use the gun, including how to load and unload the clip and different stances for holding the gun. Then, he said they sat down on the couch and she put her hand on the gun and it fired. They arrested him, and the magistrate issued a warrant for reckless handling of a firearm and released him on an unsecured bond that morning. (*Id.* at 41.)

Meanwhile, at the hospital, Mary underwent surgery for her serious injuries. The surgeon removed one bullet and several fragments, where the bullet had shattered a vertebra at L5; the bullet had travelled at an upward angle, entering her right leg, exiting her abdomen and re-entering her abdomen before striking the vertebra. Mary suffered paralysis of her right leg for several months, requiring the assistance of a walker or wheelchair and undergoing several surgeries and physical therapy. She also developed vascular necrosis in her knees, that carried a risk of needing future knee surgery. (*Id.* at 1405.)

According to the Commonwealth, police again responded to Moore's home at 4:47 p.m. that same afternoon, when Moore called complaining that Coleman was banging on the door and trying to get in. When the officers arrived, Coleman had left. He returned after 7:00 p.m. to pick up his Isuzu Trooper that had been parked there since midnight before. Mrs. Cook went outside

to tell Coleman that he was no longer welcome on their property. She called police at 7:25 p.m., saying that he had backed up and tried to hit her with his vehicle. He then backed into a stop sign and sped to the end of the dead-end road and turned around, speeding off in the other direction and nearly striking another person. (*Id.* at 42.)

B. *Roanoke City*

According to the Commonwealth's proffer at the Roanoke City plea hearing, around 11:00 p.m., the same day, March 17, Coleman and Nutt were at the Bridge Street Grille in Roanoke City, for the second time that evening (previously having been there at 6:00 p.m.). They were sufficiently intoxicated that the bartender was serving Coleman only Coke, with no alcohol in it, because they had cut him off. Tyler Durham, a regular customer at the Bridge Street Grille, was also present. An off-duty bartender reported observing some brief conversation between Coleman and Durham, in which Coleman said something like "You look scared to me." Ten minutes later, Durham approached Coleman as if to shake hands, but Coleman put up his hands to signal don't come any closer. Twenty minutes after that, Durham went to the men's room. Nutt and Coleman followed him in there, and Nutt locked the door behind them and blocked it. They assaulted him and pulled him to the floor, where they repeatedly stomped and kicked him until the manager picked the lock to get the door open. Nutt and Coleman then ran away, and the manager helped Durham get up. Someone got the license plate from Coleman's Isuzu Trooper as he and Nutt left the bar. (*Id.* at 29–31.)

Durham was hopping on one leg, and his companion drove him to the hospital, where he was diagnosed with an ankle broken in three places. Because of the swelling, he was told that they could not perform surgery for another week. When he got home from the hospital, Durham called the police to report the incident. Running the license plate led the city investigators to contact the county police, and they got pictures of both Coleman and Nutt for a photo lineup. Durham

identified both of them as the assailants.  The city officers obtained warrants for abduction and malicious wounding.  (*Id.* at 31–32.)

Durham underwent surgery with Dr. Chandler, who used two rods and nine screws to repair the ankle.  Dr. Chandler felt that Durham made a full recovery, but Durham sustained $2500 in medical co-pays and missed substantial time from work.  (*Id.*)

## II. PROCEDURAL HISTORY

A.  *Criminal Proceedings*

Initially, Coleman was charged with reckless handling of a firearm in Roanoke County; after receiving calls from Mr. Moore and Mrs. Cook during the afternoon and evening of March 17, additional warrants were secured for trespass, attempted burglary, two counts of attempted malicious wounding, failure to stop at the scene of an accident, and reckless driving.  After learning about the Roanoke City charges involving Tyler Durham, Roanoke County obtained additional warrants for assault and battery and abduction of Mary Cook-Moore, to go with the original firearm charge.  On May 20, 2011, Coleman waived his preliminary hearing on the felony charges and pled guilty to the reckless driving and misdemeanor hit-and-run charge.  The prosecution nolle prossed the misdemeanor assault and firearm charges, instead choosing to direct indict for aggravated malicious wounding. The Roanoke County General District Court imposed six months jail and a $1000.00 fine for reckless driving and thirty days for the misdemeanor hit and run, both of which were appealed to the Circuit Court.  (Roanoke Co. Trial R. 4–5, 15, 21–24, & 29.)

The matter was continued several times, and on May 18, 2012, Coleman pled guilty to abduction, reckless driving, and malicious wounding as a lesser-included offense of aggravated malicious wounding, without any sentencing agreement.  The remaining matters (attempted burglary, two counts of attempted aggravated malicious wounding, and misdemeanor hit-and-run)

were nolle prossed.  (Habeas R. 57–58).  The matter was consolidated for sentencing with the Roanoke City Circuit Court matters, which were presided over by the same judge.

In Roanoke City Circuit Court, Coleman entered a plea agreement in which he agreed to plead no contest to malicious wounding.  The Commonwealth agreed to nolle pross the abduction charge and to request a sentence no higher than the maximum sentence recommended by the guidelines.  However, the agreement acknowledged that the final sentence would be up to the court.  (Roanoke City Trial R. 64.)  Coleman entered his guilty plea on August 25, 2011, and the court accepted his plea as knowing, voluntary, and supported by the facts.  The court also ordered a presentence report and a victim impact statement.  (Habeas R. 15–37.)

The joint sentencing hearing was held on August 24, 2012.  The probation officer testified that she had prepared the presentence report and sentencing guidelines.  She testified that Coleman denied any juvenile court history, and that she had found no court records, but had found a juvenile probation report in the juvenile probation office, revealing that Coleman had six contacts with the juvenile justice system, including one in Carroll County, three charges in Rockbridge County, and the rest in Roanoke County.  Two of the charges were felonies, including a breaking and entering, and he had been adjudicated guilty of all offenses.  All charges were transferred to Roanoke County for supervision, and Coleman had at least two violations of probation.  He successfully completed the Impact 180 program, but less than a year later, returned to court for a probation violation involving use of marijuana.  Finally, a CHINS (child in need of services) petition was filed in December 2005, and she did not know what happened thereafter.  The probation officer further testified that she believed Coleman intentionally tried to deceive her about his juvenile history.  Coleman claimed to be suffering from a brain injury at the time of the offense, due to his service in Afghanistan.  She confirmed that Coleman had been transferred to Ft. Bragg on medical leave,

but said she received no records from the military to corroborate a brain injury.  Coleman's attorney did not challenge any of her testimony on cross-examination.  (*Id.* at 63–70.)

At the court's request, the probation officer had prepared a set of guidelines for Roanoke County and a separate set for the Roanoke City offenses, as well as a separate set of guidelines for all offenses as a single sentencing event.  (*Id.* at 63.)  All guideline calculations treated Coleman as a category II offender because of the juvenile adjudication for breaking and entering.  The guidelines for the Roanoke County offenses recommended a range from 4 years, 7 months to 10 years, 3 months, with a midpoint of 8 years, 7 months.  (*Id.* at 549.)  The Roanoke City guidelines recommended a range from 3 years, 9 months to 8 years, 4 months, with a midpoint of 7 years; the guidelines combining all offenses from both jurisdictions recommended 7 years, 4 months to 18 years, 3 months, with a midpoint of 13 years, 7 months.  (Roanoke City Trial R. 140, 82.)

Mary Cook-Moore testified that she was paralyzed on her right side, from her belly-button to her toes, because of the injury, requiring a wheelchair or walker to move around.  She claimed that she was probably going to lose her right leg to amputation because of vascular necrosis caused by her injuries.  She also said she had lost hearing in her right ear and that the rods and internal scar tissue in her spine caused a great deal of pain.  She suffered from frequent blood clots and had to take expensive medicine. The gunshot injuries combined with her pre-existing health condition (Crohn's Disease) caused significant limitations on her life and led to a stress-related adrenal gland deficiency that could be fatal.  Previously she had been an active equestrienne but now could no longer be around horses.  She said she had a caretaker around the clock, because she could not bathe herself or go to the bathroom without assistance.  (Habeas R. 72–78.)

Coleman testified that he had enlisted in the Army in March 2007.  After basic training, he spent a year in Iraq.  He said that he excelled in the military, and his year in Iraq was the best in his life.  He re-enlisted, planning to make the Army his career.  He was then stationed at Ft. Bragg

in North Carolina, where he trained new soldiers for a year before being stationed in Afghanistan. In October 2010, while on foot patrol with his unit, another soldier stepped on an IED (improvised explosive device) which exploded, severing his extremities and killing him. Coleman had been close friends with the deceased and helped collect the man's scattered body parts for return to the family. Then, on January 19, 2011, a rocket struck and penetrated the chow tent at meal time, killing and injuring several. Coleman testified that he experienced confusion and ringing ears and believes he lost consciousness. He received medical attention for a brain injury and was sent to an Army hospital in Qatar and then to one in Germany before being sent to Ft. Bragg for further treatment at the end of February. At Ft. Bragg, he noticed feeling increasingly anxious, paranoid, and irritable. He mentioned this to his new commanding officer, who told him to go to behavioral health. He did not follow up with behavioral health as recommended. Coleman said he was not doing anything useful at Ft. Bragg, being stationed with others who would not or could not do anything, and he wanted to get back to Afghanistan. He felt compelled to get away from everyone at Ft. Bragg and took leave to return home to Virginia to visit family. He was drinking heavily and taking valium and painkillers that had been prescribed for him by the Army. (*Id.* at 79–94.)

Coleman stated that the offenses occurred just three weeks after his return to the United States. He accepted "100% responsibility" for his behavior and the harm he had caused, and he said he had not meant to cause injury to anyone. He said he was trying to teach Mary how to load and unload the gun and thought she would be less nervous if she let him show her how to use it. He has no memory of pulling the trigger. As for Mr. Durham, he said he had gone to the bathroom to resolve a disagreement and he did not intend to get violent. Once the physical fight started, he thought he was in Afghanistan and was just trying to protect himself. (*Id.* at 79–92.)

On cross-examination, the prosecutor asked him about his juvenile offenses, and Coleman admitted that he was the person charged, but he thought the records had been expunged. He

recalled going back to court after he was 18, and the judge dismissed all his charges and expunged the record so that he could join the Army, because the Army would not let him enlist with an active juvenile record. Coleman admitted that he did not disclose his psychiatric history to the Army before joining. He admitted steroid use in the Army, which stopped in March 2011, which explained his loss of thirty to forty pounds from the time of his arrest to the sentencing hearing. The prosecutor asked Coleman about the brain injury, suggesting that it must not have been severe if there were no medical records documenting it. Coleman maintained that he had sustained the brain injury and was treated for it by the Army overseas. (*Id.* at 93–107.)

In pronouncing his sentence, the Judge noted the irreparable physical and emotional damage caused by Coleman's behavior and said, "If any case could be made right by sentence, this one clearly could not." (*Id.* at 138.) He acknowledged Coleman's military service as commendable, but said that the nature, quality, and magnitude of his crimes was such that he "could not expect the citizens of the Roanoke Valley [or] . . . anyone else to have any respect for the law" if the sentence were not severe. (*Id.*) Finally, he said that "this case cannot be judged under the guidelines." (*Id.*) He then sentenced Coleman exactly as requested by each prosecutor. On the Roanoke City charge of malicious wounding, he sentenced Coleman to fifteen years, with eight years suspended for indefinite probation (leaving an active sentence of seven years, the midpoint of the guidelines as calculated solely for the Roanoke City offense). (Roanoke City Trial R. 89–92.) On the Roanoke County charges, he sentenced Coleman to twenty years for malicious wounding, with five years suspended, ten years for abduction, with five years suspended, and twelve months for reckless driving. The total sentence from Roanoke County was thirty-one years, with ten years suspended, and indefinite supervised probation. (Roanoke Co. Trial R. 131–34.) The active sentence of twenty-one years exceeded the sentencing guidelines for both the county charges alone and the combined guidelines. When combined with the sentence on the city charge,

Coleman received an active sentence of twenty-eight years, with another eighteen years suspended, or forty-six years total.

Coleman's trial counsel withdrew after the sentencing hearing, and another attorney represented Coleman on appeal. (*Id.* at 140.)  The Virginia Court of Appeals denied the appeals on March 7, 2013, and the Supreme Court of Virginia denied the appeals on August 28, 2013. (Habeas R. 12–14; Roanoke City Trial R. 151, 155–56.)

*B.  State Habeas Proceedings*

On August 1, 2014, Coleman filed identical state habeas petitions in the Roanoke County Circuit Court and the Roanoke City Circuit Court, raising a single claim of constitutionally ineffective assistance of counsel at his sentencing hearing.  In particular, the petition alleged that counsel was negligent in: (1) failing to obtain the medical records from the military, showing that Coleman had sustained two traumatic brain injuries for which he was treated; (2) failing to obtain treatment records from Lewis-Gale for March 18, 2011 (the day after the crimes were committed) through March 24, 2011, when he was hospitalized for treatment of substance dependence and post-traumatic stress disorder (PTSD); and (3) failing to have a psychological evaluation of Coleman in preparation for the sentencing hearing.  (Habeas R. 4–9.)

On January 8, 2015, Coleman filed an amended petition, with leave of the court and by agreement of counsel.  The amended petition expounded on trial counsel's duty to properly prepare for sentencing and added a report from Dr. Rogers, opining that Coleman's actions on March 17, 2011, were the result of his untreated traumatic brain injuries and his PTSD.  Coleman argued that the evidence counsel failed to obtain and introduce would have added up to a mitigation case "that bears no relation" to the cursory view of Coleman actually presented at the sentencing hearing, leaving the court with only the prosecution's presentation of petitioner as someone "failing to have the normal aspect of humanity."  (*Id.* at 490–501.)

10

By March 4, 2016, new counsel represented Coleman on his state habeas, and he filed a motion for leave to file a second amended petition and lodged the second amended petition with the court.  This pleading further elaborated on trial counsel's failure to prepare adequately for and present available evidence at Coleman's sentencing hearing, including counsel's failure to object to major inaccuracies in the presentence report and calculation of the guidelines, failure to seek exclusion of Coleman's juvenile arrest record because all charges had been dismissed and expunged, failure to introduce Coleman's complete record of military service (including the medical records), and failure to contradict the Commonwealth's false narrative that painted Coleman as a cruel, violent, and compassionless person.  (*Id.* at 1048–49.)  Following the state's objection to another amended petition, the court denied leave to file the second amended petition; however, the court held an evidentiary hearing allowing counsel to introduce any and all evidence related to the allegations in the original and first amended petition, including inadequate preparation for sentencing and inadequate performance at sentencing.  (*Id.* at 1422–23.)

Counsel introduced both testimonial and documentary evidence at the hearing on July 12, 2017.  First, Tracey Berry, a probation officer for the 23rd Juvenile District Court Services Unit (CSU) testified that she had worked with Coleman from early 2003 until late 2005.  She remembered him particularly well because she remembers her "really good" and "really bad" cases, and Coleman was the best she worked with.  She was assigned to mentor him, and in that capacity, she saw him as often as twenty hours per week.  She described him as "a compassionate young man that never was violent in any way, shape or form."  (*Id.* at 1598.)  He was adored by everyone working in the CSU.  (*Id.* at 1595–98.)

Ms. Berry's testimony put Coleman's juvenile history into context.  At age twelve, Coleman became extremely suicidal and self-destructive, but he was not violent towards others.  His first placement in a group home was post-psychiatric hospitalization, not the result of

delinquency.  His father, absent since the first year of Coleman's life, reappeared then, providing alcohol and drugs to Coleman, until his dad was arrested for manufacturing child pornography.  In the summer of 2003, Coleman and a friend climbed in through the window of a fraternity house and stole some beer, resulting in three charges, and he stole a car.  He successfully completed the Impact 180 program, doing quite well.  He had a serious problem with alcohol and drugs, however, and continued needing supervision for help with that issue and his mental health.  He had no new criminal charges after age fifteen.  Starting in January 2005, Coleman experienced several additional psychiatric hospitalizations, often resulting from paranoid psychoses in which he saw and spoke to people who were not present.  He was variously diagnosed as bipolar or schizophrenic.  He also continued to abuse alcohol and marijuana.  It was strongly recommended that he be sent to a closed facility for treatment of his condition, but his mother could not afford her share of the cost ($960 per month).  Although his mother appeared concerned, many working with the family perceived her to be part of the problem, and there were concerns that Coleman may have been sexually abused.  Finally, in September 2005, after Coleman had a psychotic break with reality at school, he was returned to Lewis-Gale hospital.  He was tested for drugs on admission and was clean; he had not been using.  After this hospitalization, his mother agreed to give custody to the Department of Social Services so that funds could be provided to place Coleman in treatment.  (*Id.* at 1599–1615.)

Coleman was placed in Poplar Springs for stabilization of his mental health condition and continued substance abuse treatment.  Records from Poplar Springs show an initial diagnosis of bipolar disorder, not schizophrenia, and the treating physician replaced his antipsychotic medication with Depakote for treatment of bipolar disorder.  As he continued to improve, the medication was discontinued, and the emphasis remained on the need to avoid mood-altering substances.  Six months after his admission, Coleman was released from Poplar Springs and went

to Youth Intercept for development of independent living skills.  According to Ms. Berry, Coleman did not wish to return home, and the CSU did not believe returning home was in his best interest. Coleman wanted to join the Army but could not do so with a juvenile criminal record.  He went back to court on a follow-up, and the judge advised Coleman that if he continued doing well and successfully transferred to independent living as an adult, to come back to court; the judge would clear his record at that time, so he could join the Army.  Coleman went back to court in February 2007, having successfully completed his treatment and transition, and the judge dismissed all his charges, so that Coleman had no record.  (*Id.* at 1605.)

Elizabeth Pfeiffer testified that she worked with Coleman at the Mill St. Grill in Staunton, Virginia, and when he turned eighteen and left Youth Intercept, she rented a room to him until he reported for military training a few months later.  Her ex-husband, a police officer, approved of Coleman being a tenant.  Coleman was helpful to her around the house, interacted well with her 7-year-old son, and was always kind and helpful.  (*Id.* at 1617–19.)

Col. Gaylord was Coleman's commanding officer in Afghanistan.  He first met Coleman when Coleman was stationed at Ft. Bragg after returning from Iraq.  Coleman was training newer soldiers at Ft. Bragg.  Gaylord selected Coleman to be a squadron commander in the Colonel's personal security detachment; Coleman was one of fifteen soldiers so selected out of 400, and Gaylord selected him because of his character and skill, particularly his trustworthiness.  The unit deployed to Afghanistan in July 2010.  Within two months, Coleman's vehicle hit an improvised explosive device (IED), and Coleman was injured during that event but quickly returned to duty. On October 14, 2010, Sgt. Eric Newman stepped on an IED while the unit was on foot patrol, and Newman's extremities were blown off his torso, killing him immediately.  Coleman, who was close friends with Newman, was only 30 feet away from the explosion.  He stayed to assist in collecting Newman's limbs to put with the body.  He was then treated for traumatic brain injury

13

from the explosion but thereafter returned to duty. Coleman and the entire squadron were devastated by Newman's death. (*Id.* at 1621–27.)

In January 2011, an enemy rocket struck the chow hall at Kandahar Airfield, injuring and killing several people. Coleman was injured by shrapnel and suffered a concussion requiring immediate treatment. Gaylord noted that soldiers were not wearing protective equipment in the chow hall, as they would have been on the battlefield, rendering the intensity of injuries much higher. Coleman's injuries exceeded the capacity of the highest-level medical facility available on Kandahar, so he was sent to a U.S. hospital in Qatar. Some time after that, Gaylord received paperwork to authorize Coleman to return to the U.S. for more medical treatment. Other than the two brain injuries, he was not aware of any other ongoing treatment Coleman may have needed; he never discussed behavioral health with Coleman and did not know of Coleman's substance abuse problems. He expressed awareness that many soldiers did not seek behavioral help they needed because of the stigma and fear of adverse impact on their military careers. Gaylord did not see Coleman after January 2011, but the crimes committed in March 2011 were completely out of character with the soldier he knew, and he had no doubt that Coleman's service experiences caused the changes in his behavior. (*Id.* at 1627–35.)

Military medical records corroborated that Coleman experienced two traumatic brain injuries in Afghanistan within a six-month period. During hospitalization at Lewis-Gale in March 2011, Coleman was diagnosed with PTSD. Those records also revealed extensive use of alcohol and prescription opiates to cope with his PTSD symptoms. Military records corroborated Coleman's service history, as Coleman recounted at the original sentencing hearing and as testified by Gaylord. At discharge, Coleman had achieved the rank of E-5 (Sergeant), and his DD-14 reflected that Coleman earned the following awards during his four-year tenure in the Army: Purple Heart, Army commendation medal, Army achievement medal, NATO medal, Army Good

Conduct medal, National defense service medal, Afghanistan campaign medal (2 stars), Global war on terrorism expeditionary medal, Iraq campaign medal (1 star), Army service ribbon, Overseas service ribbon (2nd award), and Combat action badge.  (*Id.* at 1061.)  None of these records were introduced at Coleman's sentencing hearing.  Coleman's trial counsel signed an affidavit acknowledging that he was ineffective for failing to obtain any of these records, and he opined that his ineffectiveness resulted in a prejudicial outcome for Coleman.  (*Id.* at 176.)

Alexis Mooney testified at the evidentiary hearing that she first met Coleman in Ft. Bragg in 2009.  Her husband was a trainee under Coleman at the time.  She interacted with Coleman on a near daily basis at Ft. Bragg, and she described him as someone his people went to if anything went wrong.  She described his military abilities as "incredible," but she noted that he was very compassionate and would not hurt a fly.  At parties, he drank less than anyone else, and if anyone got into a scuffle, he was the one to break it up.  She stayed in touch when the squadron deployed to Afghanistan.  She testified that the entire squadron was affected by Newman's death; nobody was the same.  Coleman came to visit when he returned to the U.S., and she said it was "like there wasn't really anything there."  (*Id.* at 1641.)  He did not seem like himself at all, and his memory was gone.  Coleman did not even remember her and her husband's chihuahua that he had played with all the time before deploying.  She also noted that Coleman did not receive the eleven-day program for transitioning to civilian life that most of the returning soldiers received when they came to Ft. Bragg after deployment.  She testified that she reached out to Coleman's trial counsel several times by email and by phone, advising that she and several others from Ft. Bragg would

come to court to support him, but no one ever notified her of the hearing date.  She called Coleman's mother, but never received a return phone call.[2]  (*Id.* at 1637–44.)

Consistent with Ms. Mooney's testimony about changes in Coleman's behavior, Coleman's stepfather, Alex Biles, also testified.  He had started dating Coleman's mother in 2001, when Coleman was eleven years old.  He described Coleman as a fun-loving child who was kind, artistic, musical, and had a good sense of humor.  Biles' son Hunter was two years younger than Coleman, and Coleman became good friends with Hunter.  In middle school, Coleman joined the football team, but did not complete the season; Biles said that even though Coleman was the biggest kid on the field, he would not hit or tackle anyone because he didn't want to hurt someone. Around the time Biles married Coleman's mother, after dating for a couple of years, Biles met Coleman's biological father.  Coleman spent time in Lexington during summer 2003, presumably to stay with his paternal grandmother, but it turned out he was spending time with his father. That concerned Biles, because Coleman's dad had been in jail longer than Biles had known Coleman. That summer is also when Coleman got in trouble with the law.  Biles described Coleman's mom as a compassionate woman who was involved in a lot of social causes; she was an "O.K." mother, but pulled in many different directions, with a biological daughter to care for and a stepson.  (*Id.* at 1584–89.)

Biles maintained a good relationship with Coleman even after his marriage to Coleman's mother ended.  He and Coleman's mother were both present for one of Coleman's hearings, but no one advised him to come to the sentencing hearing, and he does not know if Coleman's mother was there, either.  At the time of the habeas hearing, Biles lived in Huntsville, Alabama, but came

---

[2] When Coleman returned from Afghanistan, Mooney was still married.  At some point after Coleman was in jail, she and her husband divorced.  At the habeas evidentiary hearing, she testified that she was then married to Coleman.  (Habeas R. 1637.)

up for the hearing. He testified that he and Coleman met up in Gatlinburg at the end of February, after Coleman came home from Afghanistan; they were going to go mountain biking together. However, Coleman was agitated and paranoid, drinking constantly (anything he could get his hands on) and wandering in the street. Coleman kept looking over his shoulder and around corners like he expected someone to shoot at him. Even though Coleman had some problems with drugs and alcohol in high school, he had never seen Coleman like he was in Gatlinburg. (*Id.* 1589–94.)

Coleman testified that his trial counsel visited him at the jail to review the presentence report two or three months before the sentencing hearing. He was surprised to see the juvenile record in his presentence report and told his attorney that all of it had been dismissed and expunged. He told his attorney that he could not get into the Army until that happened. He also testified that no one was present for his sentencing hearing, not even his mother. (*Id.* at 1647–48.)

The government called trial counsel as its only witness. He testified that he did not recall his conversation with Coleman about the presentence report and the juvenile record, but he said that the discussion could have taken place. Many of his clients think that their juvenile record is automatically expunged when they turn eighteen. He never spoke with Ms. Berry or anyone from juvenile probation before the sentencing hearing. He did speak with Gaylord. He remembers being impressed that Gaylord said he would rate Coleman "in the top 1% of all soldiers that he's had under him and that he wanted Mr. Coleman as his personal bodyguard and would trust him with his life." (*Id.* at 1649–53.)

In his post-hearing brief, Coleman argued that trial counsel's failure to present corroborating medical evidence regarding Coleman's brain injuries allowed the government to question the existence of those injuries at sentencing, to Coleman's detriment. By failing to obtain his psychiatric records from Lewis-Gale and to have an evaluation of Coleman's psychological condition, trial counsel omitted the strongest mitigating evidence available. By failing to present

the full picture of Coleman's military service, counsel failed to contradict the state's narrative that Coleman was and had always been nothing more than a law-breaking, violent person.  By failing to investigate and learn the truth about Coleman's juvenile court background, counsel allowed prejudicial information into the record that should have been excluded; if the court were to consider that evidence, counsel should have at least ensured that all of it was presented in context, and not just the parts that made Coleman appear incorrigible.  At sentencing, the court received no information about Coleman's successful completion of treatment at Poplar Springs, successful placement at Youth Intercept, and successful transition to independent adult living before entering the Army.  The sentencing court was left with the impression that Coleman was in court in 2005 for new misconduct, rather than for assistance in securing funding for psychiatric treatment.  The court was not provided proof that Coleman's juvenile charges had been dismissed and expunged. Coleman was scored as a category II offender on the sentencing guidelines because of the juvenile burglary charge; otherwise, his guidelines would have been lower.[3]  (*Id.* at 1454–96.)

The state's post-hearing brief did not argue that trial counsel's performance was reasonable, only that his performance did not prejudice Coleman because Coleman's brain injuries were not sufficiently severe to mitigate his culpability for the crimes and a psychological evaluation before sentencing would not have produced information any different from that which was already made known to the court.  The state argued that the medical records regarding PTSD from Lewis-Gale also contained information about excessive alcohol consumption and drug use, which would aggravate rather than mitigate the offenses.  Further, medical records regarding his

---

[3] Without the category II enhancement, the midpoint on the city guidelines would have been 4 years, 2 months instead of 7 years; the midpoint on the county guidelines would have been 5 years, 9 months instead of 8 years, 7 months, and the midpoint on the combined guidelines would have been 10 years, 3 months instead of 13 years, 7 months.  Thus, the guideline calculations were significantly affected by the erroneous inclusion of Coleman's expunged juvenile burglary.

adolescent psychiatric treatment also revealed ongoing substance abuse issues and would have revealed his frequent contact with the juvenile justice system.  Finally, any error in calculating the guidelines did not affect the outcome because the sentencing judge had already indicated that "this case cannot be judged under the guidelines."  (*Id.* at 1435–53.)

The state habeas court denied Coleman's petition.  The presiding judge (the same judge who presided over the original sentencing hearing) entered orders holding that Coleman was not prejudiced by any deficient performance of his counsel because (1) a mental evaluation at sentencing would not have provided any new information and, therefore, would not have altered the outcome; (2) introduction of the military medical records and Lewis-Gale medical records would not have provided information any different from Coleman's testimony at the sentencing hearing, while his psychiatric records contained much exacerbating information about his substance abuse history; (3) introduction of additional medical, social service, psychological, and school records from Coleman's childhood would not have affected the outcome, because these records, although more detailed, contained no essential facts that had not already been mentioned in the presentence report; and (4) any error in calculating the guidelines by including Coleman's expunged juvenile burglary charge was harmless, because the court based its sentencing decision on other factors, not on the guidelines.  (*Id.* at 1527–28.)  For the Roanoke County habeas case, the order was entered May 16, 2018 (*id.* at 1528), but the order in the Roanoke City case was entered May 18, 2018.  (Order, Resp't's Br. in Supp. of Mot. to Dismiss, Ex. E, Dkt. No. 7-5.)

Petitioner appealed the state habeas ruling to the Supreme Court of Virginia.  On November 20, 2018, the Roanoke County appeal was dismissed as untimely perfected.  (Habeas R. 1544.)  On April 1, 2019, the Supreme Court of Virginia denied Coleman's appeal from Roanoke City habeas decision.  (Order, Resp't's Br. in Supp. of Mot. to Dismiss, Ex. H, Dkt. No. 7-9.)

## III. CLAIM

In his current petition, Coleman raises the same claim raised in his state habeas, ineffective assistance of counsel in preparing for and conducting the sentencing hearing.  Specifically, he alleges that trial counsel was ineffective in failing to have Coleman evaluated for mental illness, failing to adequately investigate and obtain records, and failing to introduce the trial court to more than a cursory view of Coleman.  (Pet. 18, Dkt. No. 1.)

## IV. DISCUSSION

### A.  Timeliness and Exhaustion

As amended by the Antiterrorism and Effective Death Penalty Act (AEDPA), federal statutes require state prisoners to meet several procedural requirements before a federal court may grant relief in habeas corpus.  First, the petitioner must file his claim timely, generally within one year from the date on which the state court judgment became final.  28 U.S.C. 2244(d)(1)(A).  Next, he must exhaust his state court remedies before filing in federal court.  28 U.S.C. § 2254(b)(1)(A).

A petitioner has one year in which to file a federal habeas corpus petition.  This statute of limitations runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Coleman has alleged nothing to support application of § 2244(d)(1)(B)-(D). Under § 2244(d)(1)(A), Coleman's convictions became final on November 26, 2013, when his time to file petitions for writ of certiorari to the Supreme Court of the United States expired, and the statute of limitations began to run on that date.

Section 2244(d)(2) tolls the federal limitation period during the time in which "a properly filed application for State post-conviction or other collateral review . . . is pending." *Id.* When Coleman filed his habeas petitions in Roanoke County Circuit Court and in Roanoke City Circuit Court on August 1, 2014, 258 days had elapsed. A state habeas proceeding is "properly filed" when its delivery and acceptance comply with the applicable laws and rules governing filings. *Artuz v. Bennett*, 531 U.S. 4, 8 (2000); *see also Pace v. Diguglielmo*, 544 U.S. 408, 414 (2005). Coleman's state petitions were properly filed, so the statute of limitations stopped running on August 1, 2014, leaving 107 days of the year unused. The statute remained tolled so long as the state habeas remained pending. A matter is "pending" in the state court so long as it has not been completed. *Carey v. Saffold*, 536 U.S. 214, 220 (2002). The Roanoke County petition and the Roanoke City petition were not pending for the same period of time; therefore, the timeliness analysis differs for the two cases.

- *Roanoke County Circuit Court convictions*

The Roanoke County Circuit Court dismissed Coleman's habeas by order entered on May 16, 2018. (Habeas R. 1515–28.) Coleman filed a timely notice of appeal, simultaneously with filing his notice of appeal from the Roanoke City Circuit Court habeas decision. However, Coleman also filed his petitions for appeal on the same day, the last day that the petition could be

timely filed for his appeal from the Roanoke City order.  He failed to realize that the Roanoke City order was entered two days later than the Roanoke County order, rendering the petition for appeal from Roanoke County Circuit Court two days too late.  The Supreme Court of Virginia dismissed the appeal from Roanoke County Circuit Court on November 20, 2018, for Coleman's failure to comply with Rule 5:17(a)(1) of the Rules of the Supreme Court of Virginia.  (Habeas R. 1544.)  Once dismissed, the state habeas proceeding was no longer pending.

Tolling is an interruption of the one-year period, a pause of the clock.  Once the state habeas is no longer pending, the clock resumes at the point where it was when it stopped; the statute does not begin anew.  *Harris v. Hutchinson,* 209 F.3d 325, 327 (4th Cir. 2000).  Therefore, the 107 days remaining on the statute of limitations began running on November 20, 2018, and his § 2254 petition was due on or before March 7, 2019.  Coleman did not file the § 2254 petition until May 23, 2019, two and half months too late.

The Supreme Court has recognized that the statute of limitations for habeas petitions is subject to equitable tolling, if the petitioner has pursued his rights diligently and some extraordinary circumstance prevented his timely filing.  *Holland v. Florida*, 560 U.S. 631, 636, 649 (2010).  However, garden variety neglect, such as counsel missing a filing deadline, generally does not constitute extraordinary circumstances.  *Id.* at 651; *Lawrence v. Florida,* 549 U.S. 327, 336 (2007).  Because there are no grounds for equitably tolling the statute of limitations on Coleman's § 2254 challenge to his Roanoke County convictions, I will grant the respondent's motion to dismiss the petition as to those convictions.

- *Roanoke City Circuit Court conviction*

Coleman's appeal to the Supreme Court of Virginia of his state habeas case in Roanoke City Circuit Court was denied by order entered April 1, 2019, and his § 2254 petition, filed May 23, 2019, was well within the 107-day limit remaining on the statute of limitations.  Accordingly,

that claim is timely.  To exhaust a claim, a petitioner must present his federal constitutional claims to the highest state court before he is entitled to seek federal habeas relief.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  By timely appealing his habeas case to the Supreme Court of Virginia, raising the same issue as raised herein, Coleman properly exhausted his state claim.

B.  *Merits of Claim*

Once the procedural hurdles are met, the federal habeas court may grant relief on a state claim adjudicated on the merits in state court only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).  A decision is contrary to federal law only if it reaches a legal conclusion that is directly opposite to a Supreme Court decision or if it reaches the opposite result from the Supreme Court on facts that are materially indistinguishable from the Supreme Court case's facts.  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  A state's decision is an "unreasonable application" of federal law only if the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter,* 562 U.S. 86, 103 (2011). The question is not whether a federal court believes the state court's decision is incorrect, but whether the decision was unreasonable, which is "a substantially higher threshold."  *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007).  Likewise, the federal court must presume that the state court's factual findings are correct, and this presumption can be overcome only "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Again, the federal court must find more than just an incorrect determination of facts, as "unreasonable determination of the facts" is "a substantially higher threshold."  *Schriro,* at 473.

In this case, the Supreme Court of Virginia issued a summary denial of Coleman's claim. The opinion of the Roanoke City Circuit Court is the last reasoned state court opinion addressing Coleman's claim of ineffective assistance of counsel. Therefore, this court "looks through" the denial of appeal and reviews the reasoning of the circuit court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (holding that when "there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim" must be presumed by the federal habeas court to rest upon the same ground.) The deferential standard of review prescribed by § 2254(d) will apply in reviewing the circuit court's opinion.

Coleman's sole claim is that trial counsel provided ineffective assistance of counsel at Coleman's sentencing hearing. When reviewing counsel's performance, courts apply a highly deferential standard. A petitioner must show that (1) counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth Amendment *and* (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Petitioner must meet both prongs of the test, as deficiency alone is inadequate, as is prejudice without deficiency. The *Strickland* standard is "doubly deferential" in the context of a habeas petition, because the deferential standard of review required by § 2254 overlaps with the deferential standard under *Strickland*. *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). In other words, federal courts on habeas review are to give the benefit of the doubt to both the state court and the defense attorney. *Woods*, 136 S. Ct. at 1151.

Because Coleman cannot prevail unless both deficient performance and prejudice are shown, if he fails to prove one prong, the court need not address the other. The state habeas court held that Coleman was not prejudiced by counsel's alleged deficiencies, and if that decision is based on a reasonable determination of facts and is not contrary to nor an unreasonable application

of federal law, this court need not and will not address the adequacy of counsel's performance. To establish prejudice under *Strickland*, Coleman must show that there was "a reasonable probability that the outcome of the proceedings would have been different," which means "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. Again, the question is not whether the federal habeas court believes that the state court was correct, but whether the state court's decision was reasonable. *Schriro*, 550 U.S. at 473. For the reasons that follow, this court cannot find that the state habeas decision was unreasonable on the factual and legal issues dispositive of Coleman's claim.

In its first ruling, the state court found that a mental evaluation of Coleman prior to sentencing would not have provided any new information that was not already available from military records and Lewi-Gale Hospital records. Military medical records documented that Coleman suffered two traumatic brain injuries while serving in Afghanistan. Lewis-Gale diagnosed him with PTSD. Coleman testified at his original sentencing hearing about the two incidents causing brain damage, and about the death of his friend because of the IED blast. He described his symptoms to the court, including the hypervigilance and paranoia that are recognized hallmark indications of PTSD. Thus, the court's factual findings are reasonable and supported by the record. The sentencing court was aware of the basic facts about Coleman's psychological condition, and an evaluation before sentencing would not have revealed more than his medical records already showed. The opinion of Dr. Rogers, introduced with the amended habeas petition, demonstrates that an evaluation would add nothing new, as she relied on the existing records to reach her diagnosis. Dr. Rogers' opinion that the PTSD and brain injuries directly caused his behavior on March 17, 2011, was conclusory and without support or explanation. Coleman failed to demonstrate that any mental evaluation before sentencing would have changed the outcome of the hearing.

25

The court's ruling that introduction of the military medical records and records from Lewis-Gale would not have altered the outcome is equally reasonable. As indicated in the previous paragraph, the sentencing court was advised of Coleman's military service, traumatic brain injuries, death of a fellow soldier, and the psychological impact of these events on Coleman's state of mind. The court was also aware that Coleman was drinking heavily at the time of both criminal events and that he was using prescription medication at the same time. While the military medical records and Lewis-Gale Hospital records provided a more objective documentation of Coleman's condition that might have been more persuasive to a jury, in the final analysis, the court concluded that he had already considered Coleman's testimony at sentencing about his injuries and mental health condition, and nothing in the medical records changed the weight he gave to those conditions when imposing an appropriate sentence. He also noted that dependence on alcohol and opiates was a prominent theme in the medical records, which he found more aggravating than mitigating. *See Barnes v. Thompson*, 58 F.3d 971, 980 (4th Cir. 1995) (finding counsel's tactical decision reasonable in not introducing "cross-purpose evidence" that aggravated as much as mitigated). While the record in this case does not support any tactical decision by Coleman's counsel, the state court's conclusion that failure to introduce the medical records did not affect the outcome of the sentencing hearing is a reasonable determination of the facts.

The state court also ruled that introduction of the additional medical, psychological, and social service records regarding Coleman would not have made any difference in the outcome. Much of the information was already contained in the PSR, including Coleman's psychiatric treatment and substance abuse treatment as a juvenile, his father's criminal record, Coleman's successful completion of the Impact 180 program, and his extensive substance abuse history. Clearly, the juvenile mental health records disclosed Coleman's history of involvement with the juvenile court. In reaching its conclusion, the state court perhaps missed the point of why Coleman

argued the records were needed:  The PSR included virtually all the negative information from those records, with very little of the positive information.  Coleman's primary argument was that the PSR should not have included any information regarding his juvenile offenses, because the charges had been dismissed and expunged, and counsel should have objected to the inclusion of the information.  Only if the information from the juvenile CSU remained in the PSR did Coleman argue that counsel should have introduced the remaining records, so that the court could view Coleman's misbehavior in context with his history of psychiatric disorders and could see Coleman's positive response to treatment in structured environments, which structure Coleman lacked at home.

The implicit holding behind the court's ruling is that counsel's failure to object to the juvenile offenses listed in the PSR did not prejudice Coleman.  When a state court's decision does not explain the basis for its decision denying a claim, the habeas petitioner must show that there was no reasonable basis for the state court to deny relief.  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).  While Coleman's objection to the PSR's treatment of his expunged juvenile offenses as prior offenses contributing to his criminal history is well-taken[4] and should have been made before sentencing, I cannot say that the state court unreasonably decided that counsel's failure did not prejudice Coleman.  Admissible evidence at a sentencing hearing includes evidence regarding the defendant's prior criminal conduct, whether adjudicated or unadjudicated, and can include a defendant's juvenile history.  *Harris v. Commonwealth*, 497 S.E.2d 165, 171 (Va. Ct. App. 1998)

---

[4] Virginia Code § 16.1-306(C) provides that the juvenile and domestic relations district court shall order the destruction of records pertaining to proceedings in which the offender has been found innocent *or the "proceeding was otherwise dismissed"* on motion and for good cause shown.  *Id.* (emphasis added).  "Otherwise dismissed" appears to be the basis on which Coleman's records were expunged.  The statute goes on to say that "Upon destruction of the records of a proceeding as provided in subsections A, B, and C, the violation of law shall be treated as if it never occurred."  Va. Code § 16.1-306(E).

(citing *Nichols v. United States*, 511 U.S. 738, 747 (1994).  Although the juvenile adjudications were vacated, there is no claim that the offenses did not occur.  Further, at the original sentencing hearing, the judge indicated that Coleman's youth (even though no longer a juvenile) was a factor the court considered, among other factors, in setting Coleman's sentence.  (Habeas R. 138.)  In the absence of clear evidence to the contrary, a judge is presumed, based on his education, training, and judicial discipline, to weigh matters appropriately during the mental process of adjudication, even if he has seen or heard evidence he should not have heard.  *Vanhook v. Commonwealth*, 578 S.E.2d 71, 73 (Va. Ct. App. 2003) (citing *Eckhart v. Commonwealth*, 279 S.E.2d 155, 157 (Va. 1981).

At the sentencing hearing on August 24, 2012, the court stated the reasons for his sentence: To protect society against crime, to provide punishment or retribution for the offense (no amount of which could undo the serious physical and emotional damage done to the victims), and to uphold respect for the law.  (Habeas R. 136–38.)  The court found the most aggravating factor to be that Coleman committed both offenses on the same day, having been questioned by police, arrested, and released on bond between the first crime and the last one.  (*Id.* at 139.)  While the judge mentioned concerns about Coleman's compassion for others based on his juvenile history, in retrospect, it is not unreasonable for the court to find that the juvenile history did not influence the sentencing decision when considering the record as a whole.  The judge also commented at sentencing on Coleman's commendable military service, during which he had been a law-abiding citizen for four years, a clear break from his juvenile past.  (*Id.* at 137.)  This supports the state habeas decision that the nature of the crimes and how closely in time they were committed were the primary factors driving the outcome, and that counsel's deficiencies did not prejudice Coleman.

Finally, the state habeas court's decision that any erroneous calculation of the guidelines[5] did not affect the outcome is also a reasonable determination of fact and law.  The judge said at sentencing "this case cannot be judged under the guidelines."  (*Id.* at 139.)  He did not discuss the recommended guideline sentencing range, either individually or combined, but referenced that both versions had been calculated, showing that he had looked at and considered them.  Virginia's sentencing guidelines are entirely discretionary; they are merely tools to be used by the judge to help determine an appropriate sentence within the statutory sentencing range.  *Luttrell v. Commonwealth*, 592 S.E.2d 752,754 (Va. Ct. App. 2004).   Unlike the federal sentencing guidelines, the Court of Appeals of Virginia has said:

> By contrast the Virginia discretionary sentencing guidelines provide only flexible guideposts for the trial judge to consider in determining the appropriate sentence with the range of punishment defined by the legislature.  Although the trial judge must provide a written explanation for departure from the guidelines . . . the judge is not bound by a presumptive range and need not justify the decision by any standard, let alone "clear and convincing" evidence.  The statute also precludes appellate review of the sentence.

*Id.* at 755.   Under Virginia state law, a trial court's failure to correctly apply the sentencing guidelines "shall not be reviewable on appeal or the basis of any other post-conviction relief."  Va. Code § 19.2-298.01(F).   Given the voluntary nature of the guidelines and the court's stated intention at sentencing not to follow the guidelines, the habeas court's decision that lower guidelines would not have resulted in a different outcome is reasonable.

Because Coleman has failed to demonstrate that the state habeas decision was an unreasonable determination of facts or an unreasonable application of federal law, I will grant the respondent's motion to dismiss the claim arising from his Roanoke City Circuit Court conviction.

---

[5] The Virginia Sentencing Commission states that "Expunged juvenile records cannot be scored on the guidelines."  Va. Criminal Sentencing Comm'n, *Sentencing Guidelines Manual* 29 (23rd ed., 2020).

## V.  CONCLUSION

For the reasons stated, I will grant respondent's motion to dismiss.  Coleman's claim arising from his Roanoke County Circuit Court convictions is untimely, and his claim arising from the Roanoke City Circuit Court conviction fails to establish that the state court's decision was unreasonable.  Further, concluding that petitioner has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(1), a certificate of appealability will be denied.

An appropriate order will be entered.

**ENTER:** This _15th_ day of June, 2020.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE